IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-836

Filed 5 August 2026

Henderson County, Nos. 22CR000085-440, 22CR000086-440, 22CR000087-440, 22CR000088-440, 22CR000089-440

STATE OF NORTH CAROLINA

v.

MICHAEL BRIAN JOHNSON, Defendant.

Appeal by Defendant from judgment entered 8 February 2024 by Judge William T. Stetzer in Henderson County Superior Court. Heard in the Court of Appeals 22 May 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General M. Denise Stanford, for the State.*

*Everson Law Office, PLLC, by Cynthia E. Everson for defendant-appellant.*

STADING, Judge.

Michael Brian Johnson ("Defendant") appeals from judgment entered after a jury found him guilty of statutory rape of a child who was fifteen years of age or younger. After diligent review, we conclude Defendant received a fair trial, free from reversible error.

## I. Background

On 21 March 2022, a grand jury delivered true bills of indictment, charging

Defendant with five counts of statutory rape of a child by an adult under N.C. Gen. Stat. § 14-27.25(a). On 6 February 2024, a hearing by the trial court ruled certain 404(b) evidence to be admissible, and trial followed.

At trial, the evidence tended to show that Madison[1] was twelve years old when she, along with her mother and younger brother, moved in with Defendant. Before moving in with Defendant, Madison lived with Rory Constant, whom Madison saw as an "adoptive grandfather." After Madison moved in with Defendant, her mother and Defendant eventually got married. During this time, Madison would also regularly spend nights at Mr. Constant's residence. Madison testified that she had low self-esteem and was nonconfrontational as a child. Madison would also try not to disrupt her mother's life or "cause her any sadness."

The first time Defendant abused Madison was when they were alone sitting on the couch watching cartoons. Madison testified, "while we were watching cartoons I felt his hand on my legs, and then they went inside my pants, and he started touching me." Madison was scared and decided not to tell her mother or any other family members. A few weeks after this first incident, Defendant began watching Madison shower through a window from the outside of the house.

Defendant's abuse escalated around the time Madison turned thirteen years old. Defendant would ask the mother to run to the grocery store to get alone time

---

[1] We use a pseudonym to protect the identity of a victim who was a minor at the time of the offense. *See* N.C. R. App. P. 42.

with Madison. Once alone, Defendant would enter Madison's bedroom and force her to have vaginal intercourse. On some occasions, when Defendant could not get the mother to leave for the store, Defendant would "knock on [Madison's] window signaling for [her] to come outside" and would take her "to the backyard and lean [her] over a chair." There were also times where Defendant "would lean [Madison] against the hood of a car." Madison testified that these encounters occurred more than fifteen times between August 2019 and December 2021.

Madison disclosed the abuse to her friend and her friend's sister. The friend's sister then informed her own mother who later spoke with Madison and her mother at a Family Dollar to discuss the allegations of abuse. While at the Family Dollar, Madison told her mother about the abuse, but neither the police nor DSS were called. Madison eventually told her mother about the abuse at the Family Dollar, but neither the police nor DSS were called. The next day after school, the mother and Defendant pulled Madison into their room and asked Madison, "why did you say this, where did this come from, why would you lie[?]" Madison felt that her mother sided with Defendant and did not believe her story. After the conversation at the Family Dollar, Madison was not allowed to visit her friend for a while. Madison testified that Defendant continued to abuse her until two weeks before she moved out from Defendant's residence.

Madison testified that after Defendant had abused her, she would usually sit in her room for a while, cry for twenty minutes, and try to be quiet so her mother

would not come into her room and start asking questions. She also stated, "after I was done and I was all cleaned up, I would go to the bathroom and clean myself up in there." As to her mental state, Madison testified, "I would cut myself, and I would think about suicide a lot. I didn't have a lot of happiness or drive to still be alive."

Eventually, Madison told Mr. Constant about the abuse and he called the police. Madison told Mr. Constant that Defendant started touching her about a year prior, and that it occurred almost every other day. Madison spoke with Betsy Sciavolino from DSS and Cuauhtli Lozada Cortes from Safelight Child Advocacy Center ("Safelight").[2] Madison told them all the details she could remember. Madison also spoke to PA Laura Phipps, who heard Madison's story and conducted a medical exam. Defendant was charged with five counts of statutory rape of a child at or under age fifteen. Thereafter, Madison, her mother, and her younger brother moved in with Mr. Constant.

When asked about being supported by her mother, Madison testified, "[o]n the outside she did, but it didn't feel like she was." Madison also testified her mother stayed in contact with Defendant and seemed "really sad" after he was charged. She added that her mother "changed tremendously," and "didn't seem like [her] mom anymore." She further recounted that her mother "just seemed like someone who

---

[2] According to its website: "Safelight is a . . . nonprofit agency that provides support for survivors of violence, abuse, and exploitation. We make it possible for individuals and families who want to be free of abuse or violence. We cultivate safer communities." https://safelightfamily.org/ (last visited July 18, 2026).

was there to say the yeses and nos." After seeing her mother act this way, Madison felt "guilty for being the cause."

Madison testified, to make her mother feel better, "I tried to say that I made up the stories to try and get the case dropped so she would be -- she wouldn't -- she wouldn't be sad." Eventually, Defendant's lawyer and Michael Dean from the public defender's office approached Madison at Mr. Constant's trailer where she was staying. Madison told the them that she made up the allegations because she "didn't like living with [Defendant] because of his rules and how strict he was." Madison also told the lawyers that she got the idea to make up these allegations from her friend, because "she had said almost the same allegations against her stepfather and nothing came about it." Madison remembered telling the lawyers that she "used that story because nothing happened with them, so I thought nothing would happen with us."

Thereafter, Madison explained why she recanted her allegations, stating:

> I felt guilty that I had made my mom sad, and I felt that I had blew up her life. Mom -- mom's happiness is very -- it was very important to me at that time. It was more valuable to me than my happiness was, so I tried to do everything I could to fix -- fix it.

Madison also told Cain Landreth, a social worker, that the allegations were not true. After telling Defendant's attorneys and Mr. Landreth that she lied about the allegations, Madison later met with PA Phipps and prosecutor Beth Dierauf. Madison told them the allegations against Defendant were in fact true.

Ms. Sciavolino of the Buncombe County Department of Health and Human Services spoke with Madison at her school. She testified that Madison reported being sexually abused on multiple occasions. Madison reported the abuse would take place in her bedroom and sometimes outside. Madison further reported that she felt unsafe and too anxious to sleep when at her mother's house because she was scared of Defendant. She was also worried about her mother and younger brother.

Mr. Lozada, who worked for Safelight, conducted a forensic interview with Madison. Mr. Lozada testified that, at this interview, Madison reported having vaginal intercourse with Defendant but made no allegations of oral sex. Detective Eric LaRowe, who observed Madison's forensic interview, recalled that Mr. Landreth and PA Phipps were also present during the interview. After the forensic interview, PA Phipps conducted a medical exam of Madison. Additionally, Detective LaRowe visited Defendant's residence where he observed the bathroom window mentioned by Madison.

PA Phipps, who worked as a physician assistant providing child medical evaluations at Safelight, was accepted by the trial court as an expert in child abuse. At trial, PA Phipps stated that when conducting her medical examination, Madison reported having been sexually abused by Defendant for the first time when she was twelve years old. Madison answered "no" to the question of whether Defendant ever made her have oral sex. Madison reported experiencing genital pain and soreness when vaginal intercourse occurred. PA Phipps testified that Madison's genital exam

was "completely normal," and that there was "no evidence of any trauma." PA Phipps further testified that she was present during a second interview with Madison, when Madison explained why she recanted her story.

At trial, the State also called Kate[3] to the stand. Kate's mother was previously married to Defendant. In April 2001, Kate was living with her mother, her brother, and Defendant. Kate had her own room and Defendant slept in a room with Kate's mother. Kate testified that Defendant, "whenever he pleased," would come into her bedroom and sexually abuse her. The sexual abuse began when Kate was only six years old. Whenever Kate tried to say something during the abuse, Defendant sought to keep her as quiet as possible. Kate testified that Defendant forced her to have anal and vaginal intercourse. This abuse took place in Kate's room, and on multiple occasions, Kate's mother and brother were present in the house.

Kate told her mother about the abuse but was "made out to be a liar." Kate explained her mother tried to get her to recant her story: "[s]he tried to record me, trying to trick me into saying that he didn't do it and that I had made it up, by recording it." There were no allegations of sexual abuse by Defendant upon her brother. Kate eventually told her stepmother about the abuse.

Defendant presented testimony from Madison's mother. This testimony tended to show that Madison's mother and her family moved from Indiana to North

---

[3] We use a pseudonym to protect the identity of a victim who was a minor at the time of the offense. *See* N.C. R. App. P. 42.

Carolina and stayed with Mr. Constant. After moving, Madison's mother met Defendant while working for the same manufacturing company, and over time, the two developed a romantic relationship. Madison's mother first moved in with Defendant by herself, while her son and Madison remained with Mr. Constant. After Madison's mother and Defendant got married, Madison and her brother moved into Defendant's three-bedroom duplex in Hendersonville. Madison's mother waited until Defendant was off probation for her children to move in with them.

Madison's mother never noticed Madison's behavior change during her relationship with Defendant and noted Madison "always kept to herself. She'd be in her room." Madison's mother acknowledged she would take trips to an Ingles grocery store and described its proximity to Defendant's residence: "If you turn out the driveway and turn right, go to the light and turn left, it's right there. It's not even like five minutes away." According to Madison's mother, she "wasn't gone more than five, ten minutes," and would go either alone or with her children.

Madison's mother first became aware of the allegations made against Defendant when she received a phone call from Mr. Constant. Madison's mother did not recall any conversation taking place at a Family Dollar. Madison's mother claimed she did not know the details of Defendant's abuse of Kate, stating, "he just told me that there was an incident and that he had served time." Madison's mother was surprised to hear Kate's testimony but stated that she still loved Defendant. When asked if Madison was making up the allegations, her mother replied, "I can't

directly answer that because there are mixed feelings. I don't know if she is or if she isn't." She added, "to my knowledge, [Madison] has never lied to me."

Defendant also presented testimony from Mr. Constant, who remembered Madison telling him about the abuse and not wanting him to call her mother. After hearing about the abuse, Mr. Constant called DSS and Madison's mother so that she would be aware. After reporting the abuse, Madison and her brother stayed with Mr. Constant. During this time, Mr. Constant remembered telling Madison to "make sure whatever you're telling is the truth because there's going to be lives be affected by it." Several months later, Madison told Mr. Constant that the allegations made against Defendant were not true.

At the conclusion of his trial, the jury found Defendant guilty of all five counts of statutory rape. The trial court sentenced Defendant to 300 to 420 months' imprisonment for each count to run consecutively. The trial court also ordered Defendant to register as a sex offender for the remainder of his life upon release from imprisonment. Defendant timely gave his oral notice of appeal in open court.

## II. Analysis

Defendant raises five issues for our review: (1) whether the trial court committed plain error in allowing witness vouching for Madison; (2) whether the trial court erred in allowing the prosecutor to ask Madison leading questions; (3) whether the trial court erred in admitting Rule 404(b) evidence; (4) whether the trial court committed plain error in allowing the prosecutor to make certain comments during

his closing argument; and (5) whether the trial court committed plain error in allowing the prosecutor to play a video during his closing argument. We consider each issue in turn.

## A. Witness Vouching

First, Defendant contends that the trial court committed plain error by allowing the prosecutor to vouch for Madison's credibility during jury selection, witness examination, and closing argument. In doing so, Defendant concedes he did not object to the testimony at trial and requests this Court to invoke its discretion under Rule 2 of the North Carolina Rules of Appellate Procedure to address his unpreserved issues on appeal.

"Rule 2 specifically gives 'either court of the appellate division' the discretion to 'suspend or vary the requirements or provisions of any of [the] rules' in order '[t]o prevent manifest injustice to a party, or to expedite decision in the public interest.' " *State v. Hart*, 361 N.C. 309, 315, 644 S.E.2d 201, 204–05 (2007) (alteration in original) (quoting N.C. R. App. P. 2). This Court has the discretion "to consider, in exceptional circumstances, significant issues of importance in the public interest or to prevent injustice which appears manifest to the Court and only in such instances." *Id.* at 315–16, 644 S.E.2d at 205 (citation omitted). Here, we decline to invoke Rule 2 as this case neither involves exceptional circumstances nor requires an expedited decision in the interest of the public. *See id.*

Defendant additionally argues for the application of plain error review. We do

so only where appropriate.

### *1. Jury Selection*

Defendant contends the prosecutor made assertive comments regarding Madison's truthfulness during jury selection. Defendant maintains his conviction was fundamentally unfair because these comments were so grossly improper that the trial court should have intervened ex mero motu.

Although Defendant broadly requests our application of plain error review on each argument of vouching, "[p]lain error analysis applies only to instructions to the jury and evidentiary matters." *State v. Greene*, 351 N.C. 562, 566, 528 S.E.2d 575, 578 (2000) (citation modified). Our precedent does not extend the plain error rule to "situations where a party failed to object to statements made by the other party during jury *voir dire*." *State v. Wiley*, 355 N.C. 592, 616, 565 S.E.2d 22, 40 (2002).

"The right to an impartial jury recognizes that each side will be allowed to inquire into the ability of prospective jurors to follow the law, and questions designed to measure prospective jurors' ability to follow the law are proper within the context of *voir dire*." *State v. Wiley*, 355 N.C. 592, 617, 565 S.E.2d 22, 40 (2002). "It is well established that while counsel are allowed wide latitude in examining jurors on *voir dire*, the extent and manner of the inquiry rests within the trial court's discretion." *State v. Crump*, 376 N.C. 375, 382, 851 S.E.2d 904, 911 (2020) (quoting *State v. Locklear*, 349 N.C. 118, 142, 505 S.E.2d 277, 291 (1998)). Trial courts are given broad discretion in managing jury selection. *See State v. Roache*, 358 N.C. 243, 270, 595

S.E.2d 381, 400 (2004) ("The trial court has broad discretion to see that a competent, fair and impartial jury is impaneled and rulings in this regard will not be reversed absent a showing of abuse of discretion.") (citation and quotation marks omitted).

In the event a defendant fails to object to a prosecutor's statements made during jury selection, error occurs only if "the comments were so grossly improper that the trial court should have intervened *ex mero motu*." *State v. Frye*, 341 N.C. 470, 491, 461 S.E.2d 664, 674 (1995). "The impropriety of the argument must be gross indeed in order for this Court to hold that a trial [court] abused [its] discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *Id.* (alterations in original) (citing *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)). " 'To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' " *State v. Ward*, 354 N.C. 231, 250, 555 S.E.2d 251, 264 (2001) (quoting *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998)). Additionally, "the comments must be viewed in the context in which they were made and in light of the overall factual circumstances to which they referred." *Id.* (quoting *State v. Call*, 349 N.C. 382, 420, 508 S.E.2d 496, 519 (1998)); *see also State v. Jones*, 347 N.C. 193, 203, 491 S.E.2d 641, 647 (1997) ("In reviewing any jury *voir dire* questions, this Court examines the entire record of the *voir dire*, rather than isolated questions."). Furthermore, "[i]t is permissible for a prosecutor during jury *voir dire* to state briefly

what he or she anticipates the evidence may show, provided the statements are made in good faith and are reasonably grounded in the evidence available to the prosecutor, as may be later revealed by evidence actually adduced." *State v. Payne*, 328 N.C. 377, 392, 402 S.E.2d 582, 590 (1991).

We consider the following statements by the prosecutor during voir dire:

> It may involve some graphic language involved with [Madison] describing what exactly happened to her. Do you have any problems listening to that?
>
> . . . .
>
> I'll tell you right now, generally, sexual assaults are crimes of secrecy, as you know. So I'm going to tell you right now I will not submit an eyewitness to the crime other than the person who's going to testify and tell you what happened to her. But there's not going to be someone to say, Oh, yeah, I saw that happen or I -- or anything like that. There's no video of it. There's no audio of it. Does that cause you any problems?
>
> . . . .
>
> All right. As I said before, this trial might involve -- well, it will involve some graphic language for the child in this case to tell you what happened to her when she was younger than 17. But does that cause anyone any problems? Do you just say, well, man, if I hear bad language I'm going to shut down and not listen to anything? Anyone have a problem with that?

In context, the record shows the prosecutor inquired into the prospective jurors' ability to be fair, impartial, and decisive after hearing the evidence. *See Ward*, 354 N.C. at 250, 555 S.E.2d at 264; *see also Jones*, 347 N.C. at 203, 491 S.E.2d at 647 (1997). Further, context reveals these statements anticipated what the evidence may

show. *See State v. Payne*, 328 N.C. 377, 392, 402 S.E.2d 582, 590 (1991) ("[I]t is permissible for a prosecutor during jury voir dire to state briefly what he or she anticipates the evidence may show."). These remarks were not improper, let alone so grossly improper as to infect the trial with unfairness thereby rendering the conviction fundamentally unfair. *Ward*, 354 N.C. at 250, 555 S.E.2d at 264 (citations omitted) (" 'To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' ").

Accordingly, the trial court did not abuse its discretion in not recognizing and correcting ex mero motu these statements which defense counsel also did not believe prejudicial during voir dire. Defendant's argument is therefore overruled.

## 2.   *Witness Examination*

Defendant next contends that plain error occurred during the presentation of evidence when the prosecutor asked Madison whether she was telling the truth to his office, PA Phipps, her older brother, and during the trial itself.

Though "it is improper . . . to ask a witness (who has already sworn an oath to tell the truth) whether he has in fact spoken the truth during his testimony," Defendant "must show plain error" since he did not object to the prosecutor's questions. *State v. Chapman*, 359 N.C. 328, 364, 611 S.E.2d 794, 821 (2005). Our "plain error standard of review applies only when the alleged error is unpreserved, and it requires the defendant to bear the heavier burden of showing that the error

rises to the level of plain error." *State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012). That said, the proponent of plain error must "specifically and distinctly" argue for such review on appeal. *Id.; see also* N.C. R. Ap. P 10(a)(4).

Plain error is defined as:

> [A] fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial[,] or where the error is such as to seriously affect the fairness, integrity[,] or public reputation of judicial proceedings[,] or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation modified); *see also Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 ("For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial.").

"To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (quoting *Odom*, 307 N.C. at 661, 300 S.E.2d at 379). That said, "[t]he plain error rule . . . is always to be applied cautiously and only in the exceptional case." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378. "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result[.]" *State v.*

*Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted); *see also State v. Carter*, 366 N.C. 496, 500, 739 S.E.2d 548, 551 (2013) (cleaned up) ("The necessary examination is whether there was a *probable* impact on the verdict, not a *possible* one.").

In this case, the record shows Madison first discussed the abuse with a friend and then that friend's mother. Madison eventually told Mr. Constant about the abuse, and the police were called. Madison testified she remembered talking to Ms. Sciavolino from DSS, Mr. Lozada, and PA Phipps from Safelight. Madison testified that, because her mother was sad, she told her that the allegations against Defendant were false. Madison also spoke to Defendant's attorney and told him she made up the allegations against Defendant because she was angry about "his rules and how strict he was" and had gotten inspiration for the story from her friend, who made similar allegations against her stepfather.

The contested line of questioning began with the following colloquy on direct examination between Madison and the prosecutor:

> Q. Do you know if [your mother] kept in contact with [Defendant] after this?
>
> A. I do.
>
> Q Did she?
>
> A. Yes.
>
> Q. When you were living with your mother up in Buncombe after all of this, did you notice any change in your mother's

personality?

A. She changed tremendously. She became -- she didn't seem like my mom anymore. She just seemed like someone who was there to say the yeses and nos.

Q. What do you mean, she didn't seem like your mom?

A. She -- she didn't seem like she wanted to do a lot of things. She would sit on the couch and she would watch TV. She seemed really sad.

Q. Did you feel bad for her?

A. I felt really guilty for being the cause.

Q. Did you try to make her feel better somehow?

A. I tried to say that I made up the stories to try and get the case dropped so she would be -- she wouldn't -- she wouldn't be sad.

Q. Okay. And did you tell your mom and [Mr.] Constant this?

A. I told -- I told them that I made the stories up.

Q. When you told them that you made the stories up, did your mother call the police and have the police come talk to you?

A. I don't -- I'm not sure who she called, but that only people who came to talk to me were [Defendant's] lawyers.

Madison was next asked the following regarding the events she reported to PA

Phipps, a prosecutor, and her older brother:

Q. After you told this story to [Defendant]'s attorney, do you remember later, on July the 20th, [2022], having a meeting with Laura Phipps?

A. I do.

Q. And I believe there was a prosecutor there, is that correct, named Beth Dierauf?

A. I believe so, yes.

Q. And did they ask you pointblank if it was true what you had told Michael Dean and Will Sullivan, if it was true that you had made all this up? Did they ask you that?

A. Yes.

Q. And what did you tell them?

A. I can't remember.

Q. Well, did you tell them that you made up a story to the attorney? Do you remember that?

A. No. I'm sorry.

Q. You don't remember that?

A. I remember meeting with her and her asking if I -- if I told them that I made it up. And I remember -- I remember at the end of that meeting telling them that I didn't want to testify and I didn't want -- I just wanted this to be over.

Q. Okay. But did you tell them that it was true what had happened between [Defendant] and you?

A. Yes.

Q. After you spoke with Laura Phipps, did you move out of the house at some point?

A. I went on a trip with my grandmother Sheila.

Q. And where does your grandmother Sheila live?

A. I believe -- right now she, I believe, is in Peru. I'm not sure, though.

Q. All right. Did you tell her the true story of what

happened between yourself and [Defendant]?

A. I did.

. . . .

Q. All right. And your older brother . . . is the one
you were referring to earlier in your testimony; correct?

A. Yes.

Q. All right. And is that in Indiana?

A. Yes.

Q. And did you tell [your older brother] the truth of what
happened to you?

A. I told him the gist of it, but I did not go into a lot of detail
with him.

Q. Okay. And let me ask you this, [Madison]. Today, what
you're telling us under oath in this courtroom about what
the defendant did to you, is that true or are you making
that up?

A. It is true.

The whole context clarifies that the prosecutor focused on what Madison had

previously told others and the inconsistencies in those versions of her story and

sought clarification of which version of events was accurate. Because Madison

initially alleged abuse, recanted those allegations, and later withdrew that

recantation, the prosecutor distinguished which story Madison told and to whom.

Even assuming error, given the context, we do not deem this was plain error. *See*

*State v. Reber*, 386 N.C. 153, 162, 900 S.E.2d 781, 789 (2024) ("[A] close case is not

enough to prevail on the prejudice prong of plain error."). That is, "viewing all the

remaining evidence, this was not a particularly strong case for the State, but it also was not a case where the jury probably would have reached a different result." *Id.* We cannot say "the jury *probably would have* returned a different result" due to this challenged portion of Madison's testimony. *Id.* at 160, 900 S.E.2d at 787 (citation omitted). Accordingly, Defendant's argument is overruled.

### 3.  *PA Phipps*

At trial, PA Phipps testified as an expert witness regarding her medical examination of Madison, the characteristics of sexually abused children, their tendency to recant allegations, and the commonality of delayed reporting in abuse cases. Defendant objected to any testimony that "could be vouching" before PA Phipps took the stand, and the trial court gave a limiting instruction—North Carolina's Criminal Pattern Jury Instruction 104.94 regarding expert testimony. Since Defendant objected, this issue is preserved for appellate review. *See* N.C. R. App. P. 10(a)(1).

On direct examination, while describing her interview with Madison, PA Phipps stated: "But in this situation the last contact had been three weeks, so there was no evidence of any injury at that time when I had seen [Madison] and taken those pictures." Defendant argues that this statement amounts to impermissible witness vouching since it was based solely on Madison's reports to PA Phipps of when she had last had sexual contact with Defendant. That is, Defendant argues PA Phipps commented on Madison's veracity because, without physical evidence of sexual

contact, the remark assumes that sexual contact occurred which is necessarily a comment on the believability of Madison.

"[O]ur Supreme Court has determined that when one witness vouch[es] for the veracity of another witness, such testimony is an opinion which is not helpful to the jury's determination of a fact in issue and is therefore excluded." *State v. Warden*, 376 N.C. 503, 507, 852 S.E.2d 184, 188 (2020) (alterations in original) (quoting *State v. Gobal*, 186 N.C. App. 308, 318, 651 S.E.2d 279, 286 (2007)). "It is well settled that expert opinion testimony is not admissible to establish the credibility of the victim as a witness." *State v. Frady*, 228 N.C. App. 682, 685, 747 S.E.2d 164, 167 (citation and internal quotation marks omitted). "In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility." *State v. Stancil*, 355 N.C. 266, 266–67, 559 S.E.2d 788, 789 (2002). "For expert testimony to amount to vouching for a witness's credibility, that expert testimony must present 'a definitive diagnosis of sexual abuse' in the absence of 'supporting physical evidence of the abuse.'" *State v. Perdomo*, 276 N.C. App. 136, 140, 854 S.E.2d 596, 600 (2021) (citing *State v. Chandler*, 364 N.C. 313, 319, 697 S.E.2d 327, 331 (2010)). "While it is impermissible for an expert to offer an opinion that a lack of physical evidence *is consistent with* sexual abuse, it may [be] permissible for the State to offer expert testimony that the lack of physical evidence *does not necessarily rule out* that sexual

abuse may have occurred." *State v. Davis*, 265 N.C. App. 512, 517, 828 S.E.2d 570, 574, *disc. review denied*, 372 N.C. 709, 830 S.E.2d 839 (2019). "Whether sufficient evidence supports expert testimony pertaining to sexual abuse is a highly fact-specific inquiry. Different fact patterns may yield different results." *Perdomo*, 276 N.C. App. at 140, 854 S.E.2d at 600.

Here, we find *Perdomo* instructive. 276 N.C. App. 136, 854 S.E.2d 596. In that case, there were no physical findings of sexual abuse. *Id.* at 141, 854 S.E.2d at 600. The prosecutor asked the expert on the stand, "[s]o even despite her disclosure of penile penetration, this physical exam is consistent and not inconsistent with that disclosure; is that right?" *Id.* The expert responded, "[t]his physical exam would be consistent with a child who had disclosed child sexual abuse." *Id.* Rather than concluding the expert witness had impermissibly vouched for the victim's credibility, this Court held that the expert appropriately provided an expert opinion that "a lack of physical findings of sexual abuse does not generally correlate with an absence of sexual abuse." *Id.* at 142, 854 S.E.2d at 601.

As in *Perdomo*, "[o]ur review of the full testimony, in proper context and beyond the isolated excerpts that Defendant challenges on appeal, reveals that" PA Phipps's testimony was "based on [her] special expertise [as an] expert, who because of . . . her expertise [was] in a better position to have an opinion on the subject than" the jury. *Id.* at 141, 854 S.E.2d at 601 (quoting *Warden*, 376 N.C. at 506–07, 852 S.E.2d at 187–88). Here, the challenged testimony does not amount to vouching for Madison's

credibility because it did not "present 'a definitive diagnosis of sexual abuse' in the absence of 'supporting physical evidence of the abuse.' " *Perdomo*, 276 N.C. App. at 140, 854 S.E.2d at 600 (citation omitted). Instead, in the context of PA Phipps's expert testimony, her medical examination considered Madison's report of when she was last abused. Madison's report that she was abused three weeks before her medical examination was necessary to understand PA Phipps's medical findings and was not used to bolster Madison's own allegations. PA Phipps's expert testimony was permissible to "aid the trier of fact to understand that the lack of physical evidence does not necessarily mean that the defendant is not guilty." *Davis*, 265 N.C. App. at 517, 828 S.E.2d at 574. Accordingly, we discern no error.

### B. Leading Questions

Defendant argues the trial court erred by allowing the prosecution to ask Madison leading questions on direct examination. At trial, Defendant objected to the prosecution's leading questions, but the trial court overruled those objections. This issue is thus preserved for appellate review. *See* N.C. R. App. P. 10(a)(1).

"A leading question is generally defined as one which suggests the desired response and may frequently be answered yes or no. However, simply because a question may be answered yes or no does not make it leading, unless it also suggests the proper response." *State v. Britt*, 291 N.C. 528, 539, 231 S.E.2d 644, 652 (1977) (citations omitted). "The general rule is that leading questions may not be asked on direct examination." *State v. Cobb*, 295 N.C. 1, 8, 243 S.E.2d 759, 763 (1978). Despite

this general rule, "leading questions may be asked of a child and particularly when inquiry is directed to 'delicate matters of a sexual nature.' The rulings of the trial judge on the use of leading questions are discretionary and will be disturbed only upon a showing of an abuse of discretion." *Id.* "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986).

Here, the following questioning occurred on direct examination of Madison:

[Prosecutor:] Was your mother's happiness important to you?

[Defense Counsel:] Objection as to the leading nature of these questions on direct.

[The Court:] Yeah. In my discretion, with a child witness, I'm going to allow minimal leading.

. . . .

[Prosecutor:] Okay. And when you said that to them, was that true?

[Madison:] Yes.

[Prosecutor:] It was true that you made all this up?

[Madison:] Oh. Sorry, no.

[Prosecutor:] Yeah. Was the story that you told them about making all this up, was that true?

[Madison:] Yes. I'm confused.

[Prosecutor:] Maybe I'm phrasing – I'm sorry, I'm confusing

> you I'll strike that. When you told [Defendant's] attorney, Mr. Sullivan, and his investigator that you had made up these charges, was that true?

> [Madison:] No.

To the extent that such questions were leading, we hold the trial court did not abuse its discretion. *See Cobb*, 295 N.C. at 8, 243 S.E.2d at 763. The record reveals that Madison was still a minor at the time she took the stand to discuss the alleged sexual abuse. *See id.*; *see also, e.g., State v. Berry*, 295 N.C. 534, 539, 246 S.E.2d 758, 761 (1978). Our review leads us to conclude that the trial court made a reasoned decision in light of the sexual nature of the case and since Madison was seventeen years old, still a minor, when she testified. *See Cobb*, 295 N.C. at 8, 243 S.E.2d at 763. The trial court's decision to allow minimal leading questions was not "manifestly unsupported by reason," such that it "could not have been the result of a reasoned decision." *Riddick*, 315 N.C. at 756, 340 S.E.2d at 59. We therefore see no merit in Defendant's argument as to this issue.

## C. 404(b) Evidence

At trial, testimony from a former victim of Defendant's sexual abuse was allowed as prior bad acts under N.C. Gen. Stat. § 8C-1, Rule 404(b). The trial court allowed the testimony to show knowledge, intent, common scheme or plan, modus operandi, and lack of accident. Defendant objected before trial and renewed his objection during trial prior to the testimony. Defendant's objection preserved this issue for appellate review. *See* N.C. R. App. P. 10(a)(1).

Defendant contends the sexual abuse of his earlier victim, Kate, "was more than 20 years prior to the present trial," and "the acts . . . were not sufficiently similar" to the sexual abuse alleged at trial. Thus, Defendant argues, he was unfairly prejudiced by Kate's testimony under Rule 403. Defendant also contends the State elicited testimony outside the proper scope of Rule 404(b) by having Kate testify to bad acts of other people, specifically Kate's mother not believing her and attempting to record her recanting her allegations.

According to our Supreme Court:

> [W]hen analyzing rulings applying Rules 404(b) and 403, we conduct distinct inquiries with different standards of review. When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

Generally, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." N.C. Gen. Stat. § 8C-1, R. 404(a) (2025). This rule helps to ensure "the State has met its burden to show that the defendant committed the alleged offense beyond a reasonable doubt, not because the jury believes the defendant may have committed similar crimes." *State v. Pickens*, 385 N.C. 351, 356,

893 S.E.2d 194, 198 (2023). Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C-1, R. 404(b) (2025). However, these prior acts may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." *Id.* These other purposes are "not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159 (citation omitted). And, "this Court has been markedly liberal in admitting evidence of similar sex offenses by a defendant." *Id.*

"If the proffered evidence is admissible under Rule 404(b), the trial court must then consider whether the probative value of the evidence outweighs its prejudicial effects." *State v. White*, 135 N.C. App. 349, 352, 520 S.E.2d 70, 72 (1999). Although a rule of inclusion, "the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403." *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988). "To be admissible, prior bad acts do not need to 'rise to the level of the unique and bizarre' and instead will be considered sufficiently similar and admissible 'if there are some unusual facts present in both crimes that would indicate that the same person committed them.'" *Pickens*, 385 N.C. at 356, 893 S.E.2d at 198 (quoting

- 27 -

*Beckelheimer*, 366 N.C. at 131, 726 S.E.2d at 159).

With respect to Defendant's temporal challenge, Kate testified that back in 2001, when she was six years old, her biological mother and Defendant were married. At that time, Kate lived with her mother, brother, and Defendant. Kate testified that Defendant would come into her bedroom and sexually abuse her on multiple occasions. The mother and brother were nearby in the house during many of these occasions. She told her mother about the abuse more than twice, but her mother took Defendant's side and "made [Kate] out to be a liar." The record shows that Defendant was convicted for sexually abusing Kate in April 2001. As a result, Defendant served a sentence from January 2002 to May 2016. Meanwhile, in this case, Defendant was indicted for acts between August 2019 and December 2021. The lapse in time between the abuse at issue here and the incidents described by Kate's testimony can be explained by Defendant's incarceration and resulting lack of access to a victim. *See State v. Pierce*, 238 N.C. App. 537, 546–47, 767 S.E.2d 860, 867 (2014) (citation and quotation marks omitted) (" '[T]emporal proximity is not eroded when the remoteness in time can be reasonably explained' such as by lack of access to a victim or by the defendant's incarceration."). Accordingly, we hold that the evidence of past instances of sexual abuse of Kate and Madison meets Rule 404(b)'s requirement of temporal proximity.

As to Defendant's contention that the acts were not sufficiently similar, evidence tended to show: both victims were minor females; Defendant appeared to

play a parental role, with both victims living with him during the time of the abuse; and Defendant married women with daughters in each situation. Additionally, in each instance, evidence tended to show both girls had their own bedrooms; the sexual abuse included vaginal intercourse with both victims; the abuse occurred multiple times with each victim; and the abuse of both victims included acts done while the mothers were present in the house. Further, the evidence tended to show a similarity in the partners Defendant selected in that both mothers were unsupportive of their respective children and remained committed to Defendant after the allegations came to light. *See State v. Aldridge*, 139 N.C. App. 706, 714, 534 S.E.2d 629, 635 (2000) ("[T]he similarities simply must tend to support a reasonable inference that the same person committed both the earlier and later acts."). The evidence thus supports the trial court's findings, which in turn support its conclusions regarding the admissibility of the prior sexual assault under Rule 404(b). *Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159.

Having found that the 404(b) evidence was sufficiently similar and not too remote in time, we now review the trial court's Rule 403 determination for abuse of discretion. *Id.* Rule 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." N.C. Gen. Stat. § 8C-1, Rule 403 (2025). The trial court found the proposed 404(b) testimony to be "relevant, admissible and not unduly or unfairly prejudicial" in its findings of fact and conclusions of law. Prior to its decision, the trial court heard

arguments from counsel and reviewed case law. It is clear the trial court took into consideration the probative value of the prior victim's testimony and whether it was substantially outweighed by the danger of unfair prejudice. Furthermore, the trial court gave a proper limiting instruction to the jury regarding the 404(b) evidence. *See Beckelheimer*, 366 N.C. at 133, 726 S.E.2d at 160 (quoting *State v. Hipps*, 348 N.C. 377, 406, 501 S.E.2d 625, 642 (1998)) ("[A] review of the record reveals that the trial court was aware of the potential danger of unfair prejudice to defendant and was careful to give a proper limiting instruction to the jury."). The trial court therefore did not abuse its discretion in admitting the 404(b) evidence.

### D. Improper Closing Argument

Defendant cites two defects with the prosecutor's closing argument. We consider each in turn.

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted); *State v. Smith*, 351 N.C. 251, 268–70, 524 S.E.2d 28, 41 (2000); *State v. Reber*, 386 N.C. 153, 163, 900 S.E.2d 781, 789 (2024). In other words,

> [T]he reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and:

> (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

Thus, where a defendant does not object "to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial." *State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 468 (2017).

As to the first prong, "[i]mproper remarks are those calculated to lead the jury astray." *Jones*, 355 N.C. at 133, 558 S.E.2d at 108 (citation modified). It "is improper for lawyers in their closing arguments to 'become abusive, inject [their] personal experiences, express [their] personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record.' " *Huey*, 370 N.C. at 180, 804 S.E.2d at 468 (citation omitted) (alterations in original); *see also* N.C. Gen. Stat. § 15A-1230 (2025) ("Limitations on argument to the jury."). Despite these confines, however, our courts have long recognized that " 'prosecutors are given wide latitude in the scope of their argument' and may 'argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *State v. Phillips*, 365 N.C. 103, 135, 711 S.E.2d 122, 145 (2011) (quoting *State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007)); *see also Huey*, 370 N.C. at 180, 804 S.E.2d at 469. As such, "prosecutors are allowed to

argue that the State's witnesses are credible." *State v. Augustine*, 359 N.C. 709, 725, 616 S.E.2d 515, 528 (2005).

As to the second prong, a "grossly improper argument is defined as conduct so extreme that it renders a trial fundamentally unfair and denies the defendant due process." *State v. Fair*, 354 N.C. 131, 153, 557 S.E.2d 500, 517 (2001) (citation modified); *see also State v. Parker*, 377 N.C. 466, 472, 858 S.E.2d 595, 599 (2021). Indeed, "[o]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693 (1996)). To that end, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. For an appellate court to order a new trial, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Huey*, 370 N.C. at 180, 804 S.E.2d at 470 (citations and quotation marks omitted). Thus, "a prosecutor's statements during closing argument should not be viewed in isolation but must be considered in the context in which the remarks were made and the overall factual circumstances to which they referred." *Augustine*, 359 N.C. at 725–26, 616 S.E.2d at 528 (citation modified). That said, "only when it finds both an improper argument and prejudice will this Court conclude that the error merits

appropriate relief." *Id.* at 179, 804 S.E.2d at 468 (citation modified). "This is an exceedingly high bar." *Reber*, 386 N.C. at 163, 900 S.E.2d at 789.

We first consider Defendant's contention that the prosecutor improperly interjected his opinion as to Madison's credibility. Defendant argues the combined effect of the prosecutor's statements regarding Madison's veracity were so grossly improper that the trial court should have intervened ex mero motu.

During his closing argument, the prosecutor made the following statements, to which we emphasize the challenged portions:

> You may say, Well, . . . why should we believe her? Well, for one, she testified up here under oath. She came here from Indiana and *she told you what happened.* And she has an incentive to tell the truth. Now there's an incentive. She's under oath. Okay. Forget about the time she was at the Safelight and she told them what happened. Forget about when she told the DSS worker what happened. You can forget about those things. She's under oath, and *she's telling you exactly what happened.*
>
> . . . .
>
> Why would she come down from Indiana and say this now? *Why does she come out of state and get up on that witness stand and tell 12 strangers intimate sexual details that happened with her unless it happened?*
>
> . . . .
>
> Because *she's telling the truth. She's telling you honestly, exactly, the best she can what happened to her.*
>
> . . . .
>
> And she told you she went to live with her step-grandmother. *She told* her what happened to her, *the true*

*story of what happened to her*. She told her brother what happened to her, the true story of what happened to her. You remember this?

(Video is played in open court.)

. . . .

No one is in the room with her. For all she knows no one's watching. What is she crying about? *I mean, if that's not real, give her an Oscar.* I mean, that's when no one's in the room. She's not trying to cry and sob and convince Mr. Lozada that, oh, she was raped. She's doing that when he's not even in the room because *it's real, because it happened to her.*

At trial, it was permissible for the prosecutor to address the issue of Madison's credibility using reasonable inferences. *See Augustine*, 359 N.C. at 725, 616 S.E.2d at 528; *see also Phillips*, 365 N.C. at 135, 711 S.E.2d at 145. But even if we were to assume, without deciding, the comments were improper, they were not so grossly improper and prejudicial as to deny Defendant due process. *See State v. Moody*, 297 N.C. App. 192, 204, 911 S.E.2d 96, 105 (2024) ("In this case, even if we assume that the prosecutor's inferential comments are improper statements by the State in service of its closing argument—mere impropriety is not enough; the comments must be so grossly improper and prejudicial as to deny the defendant due process protections.").

We next consider Defendant's argument that the "the trial court committed plain error in allowing the prosecutor to attempt to sway the jury to a verdict based on an emotional response." But "[t]he standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing

counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones,* 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted). "Moreover, plain error review does not apply to this issue because plain error is reserved for evidentiary or instructional errors. Closing arguments are not evidence." *Reber*, 386 N.C. at 163, 900 S.E.2d at 789 (cleaned up).

Defendant challenges the following statements made by the prosecutor during closing argument:

> So, yeah, it's true the people closest to her, the adults have failed her. They failed her. . . She'll be all right. But she'll never forget. She will never forget how adults treated her, how her own mother left her with a man to rape her in the house. How her mother testified at trial and said she doesn't believe her. No, she won't forget that. And she told you she went to live with her step grandmother. She told her what happened to her, the true story of what happened to her. She told her brother what happened to her, the true story of what happened to her.
>
> You remember this?
>
> (Video is played in open court.)
>
> Remember Mr. Lozada takes a break and he leaves the room?
>
> (Video continues.)
>
> What did you notice when Mr. Lozada left the room?
>
> (Video continues.)
>
> What is she doing that for? Is she trying to impress Mr. Lozada with her lies? No one is in the room with her. For

all she knows no one is watching. What is she crying about? I mean, if that's not real, give her an Oscar. I mean, that's when no one's in the room. She's not trying to cry and sob and convince Mr. Lozada that, oh, she was raped. She's doing that when he's not even in the room because it's real, because it happened to her.

Every single adult in her life let her down. Her father, biological father, never in her life. Step-kid having to live, being deserted by mom with a different person in a trailer in Buncombe County. Every single person let her down. She's vulnerable. She's exposed. And who takes advantage of someone like that? That man right there is who. That's the person that takes advantage of someone like that. Who takes advantage of a child who has chaos, who is experiencing brokenness? Who takes advantage of a child like that? He did. You certainly don't go into a ritzy neighborhood over here in Hendersonville and do that to a child of a wealthy father and mother. You certainly don't go to the hard-working blue collar man's house who's carrying a baseball bat with him and do it to his daughter. No, you find the weak. You find someone surrounded by chaos. You find someone who's broken and you take advantage of it.

. . . .

This is what he does. He finds weak, nonassertive women who he can push around, who he can control, who he can get to believe and trust him, who have young daughters who are underage -- step-kids underage living in the house, and then he takes advantage of them.

. . . .

And ladies and gentlemen, we can't stop -- we can't change the past for [Kate]. We can't change the past for [Madison]. But you know what, the buck stops here today. You are the voice and the conscience of this community, and it's got to stop. He will not take responsibility for what he did to [Madison]. He just won't.

> So on behalf of the state of North Carolina, I am asking you
> to hold him responsible. End it today. Put a stop to it.

Even assuming, without deciding that these statements are an improper appeal to the jury's emotions rather than an appeal to reason, we cannot conclude they amount to gross impropriety. *See Reber*, 386 N.C. at 164, 900 S.E.2d at 790 ("[O]ur case law has emphasized that these sorts of inflammatory statements appealing to the jury's emotions—ones that might be reversible error if preserved—still often fail to meet the much higher standard requiring the trial court to intervene on its own."). We reach this determination from a comparison of examples from our Supreme Court. *See, e.g.*, *State v. Hamlet*, 312 N.C. 162, 172–73, 321 S.E.2d 837, 844–45 (1984) (holding the prosecutor's reference to the defendant as an "animal" did not rise to the level of grossly impropriety required for ex mero motu intervention); *State v. Moseley*, 338 N.C. 1, 50–51, 449 S.E.2d 412, 442 (1994) (holding the prosecutor's brief references to victim or their families did not rise to the level of gross impropriety necessary to warrant ex mero motu intervention). Here, Defendant has not shown, and we cannot conclude, that such comments were "grossly improper and prejudicial," and the trial court did not err by declining to intervene ex mero motu. *Moody*, 297 N.C. App. at 204, 911 S.E.2d at 105 (2024).

### E.    Video Played in Closing Argument

Last, Defendant argues the trial court committed plain error by: admitting a video of Madison's forensic interview before she testified; not instructing the jury on

the use of the forensic video; and allowing the prosecutor to play the forensic video during his closing argument. Defendant concedes that he neither objected to the admission of the forensic video during the direct examination of Mr. Lozada nor during the State's closing argument; thus, this issue is unpreserved and reviewed for plain error. *See Maddux*, 371 N.C. at 564, 819 S.E.2d at 371 ("An appellate court will apply the plain error standard of review to unpreserved instructional and evidentiary errors in criminal cases.").

During the State's presentation of evidence, when conducting direct examination of Mr. Lozada, the prosecutor moved to admit Mr. Lozada's forensic interview with Madison. Defendant did not object. The trial admitted the video exhibit and the jury viewed it. Then, during the State's closing argument, the prosecutor again played the video for the jury. Again, Defendant did not object.

Defendant does not point to evidence from the video that would have caused the jury to reach a different verdict, rather he contends plain error occurred since the statements in the video were "hearsay and generally inadmissible." And while it is *possible* that the jury could have acquitted Defendant had the video not been admitted, we cannot say "absent that evidence, the jury probably would have returned a *different* verdict." *Reber*, 386 N.C. at 162, 900 S.E.2d at 789. With respect to the prosecutor's closing argument, Defendant does not object to a specific statement made by the prosecutor, instead he maintains permitting the prosecutor to play the video again was plain error. And since we have determined that the

introduction of the evidence was not plain error, the prosecutor's use of that evidence during his closing argument does not meet the 'grossly improper' standard. *See id.* at 164, 900 S.E.2d at 790 (citing *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) ("When evidence is introduced without objection at trial and does not meet the criteria for plain error, it is well within the 'parameters of propriety' for a trial court to permit that evidence to be described in closing arguments."). Defendant's argument therefore fails.

### III. Conclusion

For the reasons above, we hold Defendant received a fair trial, free from reversible error.

NO ERROR.

Judges FLOOD and MURRY concur.